# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| REBECCA L. MULLINS, )<br>    Plaintiff )<br>)<br>)<br>)<br>CAROLYN W. COLVIN, )<br> Acting Commissioner of Social Security, )<br>    Defendant ) | Civil Action No. 2:14cv00050<br>**<u>MEMORANDUM OPINION</u>**<br><br>By: P<small>AMELA</small> M<small>EADE</small> S<small>ARGENT</small><br>United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Rebecca L. Mullins, ("Mullins"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq*. (West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Mullins has requested oral argument in this matter.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642

(4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Mullins protectively filed her application for SSI on June 21, 2011, alleging disability as of March 7, 2009, due to nerves; a back condition; shoulder and hip problems; swelling of her feet; carpal tunnel syndrome; a heart attack; breathing problems; depression; stomach problems; fatigue; and difficulty concentrating. (Record, ("R."), at 175-78, 188, 197, 226.) The claim was denied initially and on reconsideration. (R. at 89-91, 95-97, 100, 103-05, 107-09.) Mullins then requested a hearing before an administrative law judge, ("ALJ"). (R. at 110-11.) A video hearing was held on May 10, 2013, at which Mullins was represented by counsel. (R. at 27-57.)

By decision dated May 24, 2013, the ALJ denied Mullins's claim.[1] (R. at 11-21.) The ALJ found that Mullins had not engaged in substantial gainful activity since June 21, 2011, the date of Mullins's application. (R. at 13.) The ALJ determined that the medical evidence established that Mullins suffered from severe impairments, namely hypertension; cervical and lumbar degenerative disc disease; obesity; a history of tachycardia; degenerative joint disease of the shoulders; myalgias; post-traumatic stress disorder, ("PTSD"); major depressive disorder; anxiety disorder; and possible borderline intellectual functioning, but he found that Mullins did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13.) The ALJ found that Mullins had the residual functional capacity to perform

---

[1] Mullins also filed an application for disability insurance benefits, ("DIB"), which was denied because she had not worked long enough to qualify for DIB. (R. at 85-87, 171-72.)

sedentary work,[2] that did not require more than two hours of standing and/or walking in an eight-hour workday and six hours of sitting in an eight-hour workday; that did not require more than occasional climbing, balancing, stooping, kneeling, crouching or crawling; that did not require more than occasional overhead reaching; that did not require constant reaching in all directions; that did not require more than occasional interaction with co-workers and the public; that allowed her to be off task 10 percent of an eight-hour workday and allowed her to be absent up to one workday a month; and that did not require more than occasional decision making and changes in the work setting. (R. at 16.) The ALJ found that Mullins had no past relevant work. (R. at 19.) Based on Mullins's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Mullins could perform, including jobs as a general production worker, a material handler and a packer. (R. at 20.) Thus, the ALJ found that Mullins was not under a disability as defined by the Act and was not eligible for SSI benefits. (R. at 21.) *See* 20 C.F.R. § 416.920(g) (2015).

After the ALJ issued his decision, Mullins pursued her administrative appeals, (R. at 7), but the Appeals Council denied her request for review. (R. at 1-5.) Mullins then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2015). The case is before this court on Mullins's motion for summary judgment

---

[2] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 416.967(a) (2015).

filed July 9, 2015, and the Commissioner's motion for summary judgment filed August 12, 2015.

## *II. Facts*

Mullins was born in 1964, (R. at 31, 175), which, at the time of the ALJ's decision, classified her as a "younger person" under 20 C.F.R. § 416.963(c). Mullins obtained her general equivalency development, ("GED"), diploma and has a degree in photography. (R. at 31, 189.) She has worked as a cook; a caretaker for the elderly; a housekeeper; and a waitress. (R. at 189.) Mullins stated that she could sit for up to 30 minutes without interruption and stand for up to one hour without interruption. (R. at 38.) She stated that she was molested by her brother when she was a child and that she had been seeing a counselor for two years. (R. at 41.) Mullins stated that she had no problems cooking for herself or taking care of her personal needs. (R. at 46.)

Robert Jackson, a vocational expert, also was present and testified at Mullins's hearing. (R. at 51-55.) Jackson was asked to consider a hypothetical individual of Mullins's age, education and no work history, who had the residual functional capacity to perform medium[3] work that did not require more than occasional climbing, balancing, stooping, kneeling, crouching or crawling; and who had no limitations on standing, walking or sitting. (R. at 51.) Jackson identified jobs that existed in significant numbers at the medium, unskilled level that such an individual could perform, including jobs as an assembler, a packer and

---

[3] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 416.967(c) (2015).

-4-

a cleaner. (R. at 51-52.) Jackson was asked to consider a second hypothetical individual, who had the residual functional capacity to perform light[4] work that did not require more than occasional climbing, balancing, stooping, kneeling, crouching or crawling; who could occasionally overhead reach and frequently reach; and who could stand/walk and sit for six hours in an eight-hour workday. (R. at 52.) He identified jobs that existed in significant numbers at the light, unskilled level that such an individual could perform, including jobs as an inspector-grader, a packer and a cashier. (R. at 52.)

Jackson was asked to consider the second hypothetical individual, but who could stand/walk for about two hours and sit for up to six hours in eight-hour workday, who could only occasionally make decisions and be exposed to occasional changes in the work setting; who could occasionally interact with the public and co-workers; who would be off task 10 percent of the workday; and who would be absent from work no more than one workday a month. (R. at 53.) He identified jobs that existed in significant numbers at the sedentary, unskilled level that such an individual could perform, including jobs as a small parts assembler, a packer and a material handler. (R. at 53-54.)

Jackson was asked to consider a fourth hypothetical individual, who had the residual functional capacity to perform light work that allowed a sit-stand option at will; that did not require climbing ladders, ropes or scaffolds, balancing, kneeling, crouching or crawling; that did not require more than occasional climbing of ramps or stairs, pushing, pulling or stooping; that did not require more than occasional

---

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2015).

overhead reaching and frequent reaching; that required no more than occasional decision making and occasional changes in the work setting, occasional interaction with the public and co-workers; and that allowed for being off task at least 20 percent of the workday and being absent from work at least two workdays a month (R. at 54-55.) He stated that there would be no jobs available that such an individual could perform. (R. at 55.)

In rendering his decision, the ALJ reviewed records from Russell County Public Schools; Julie Jennings, Ph.D., a state agency psychologist; Dr. Richard Surrusco, M.D., a state agency physician; Jo McClain, P.C., a state agency professional counselor; Dr. Joseph Duckwall, M.D., a state agency physician; Abingdon Orthopedic Associates, P.C.; Johnston Memorial Hospital; Crystal Burke, L.C.S.W., a licensed clinical social worker; Dr. Charles Wilson, M.D.; Dr. Thomas E. Roatsey, D.O.; Mountain View Regional Medical Center; and B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist.

By way of background, an MRI of Mullins's neck and back performed in 2003 was within normal limits. (R. at 348.) In October 2004, an MRI of Mullins's lumbar spine showed a bulging disc at the L5-S1 level, but no nerve entrapment or compression was noted. (R. at 298, 340.)

On April 24, 2008, Mullins was admitted to Johnston Memorial Hospital with complaints of chest pain. (R. at 272-97.) An EKG was normal, as well as chest x-rays. (R. at 273.) She was discharged the next day with diagnoses of chest pain, hypertension, tobacco abuse and depression. (R. at 272-74.) Mullins saw her primary care physician, Dr. Charles Wilson, M.D., on April 30, 2008, and her blood pressure reading was 128/86. (R. at 321.) Mullins complained of some

-6-

Case 2:14-cv-00050-PMS   Document 16   Filed 05/02/16   Page 6 of 20   Pageid#: 724

"intermittent anxiety" and reported that her antidepressant medication helped her depression "considerably." (R. at 321.) Dr. Wilson diagnosed moderately well-controlled blood pressure and minor anxiety. (R. at 321.) On March 12, 2009, Mullins reported that she was still having problems with anxiety "from time to time, but much better than before." (R. at 314.) Her blood pressure was controlled, and she was advised to quit smoking. (R. at 312.)

On June 25, 2009, Mullins sought treatment with Dr. Thomas E. Roatsey, D.O., to establish a primary care physician. (R. at 390.) At that time, she complained of hypertension, anxiety, depression, chronic low back pain and muscle spasm. (R. at 390.) Mullins stated that she had to quit work due to back pain and muscle spasms. (R. at 390.) Dr. Roatsey reported that Mullins had tenderness in the lumbar spine with decreased range of motion and positive straight leg raising on the left with weakness and a mild foot drop. (R. at 390.) He noted that Mullins's affect was flat, and she had poor eye contact. (R. at 390.) Dr. Roatsey noted that, "I advised [patient] to file for disability. She is unable to work and with her physical problems, mental problems, age, and education, she will not be able to ever return to work." (R. at 390.) Mullins returned to Dr. Roatsey in October 2009 for a rash on her arm. (R. at 389.)

Mullins next saw Dr. Roatsey in February 2010, when she complained of dizziness in the morning, head and neck pain with numbness and headaches. (R. at 388.) Examination revealed no abnormalities other than tenderness in the back. (R. at 388.) Dr. Roatsey diagnosed vertigo, hypertension, low back pain and anxiety. (R. at 388.) On December 6, 2010, Mullins complained of depression and back pain. (R. at 499.) Dr. Roatsey noted that, although Mullins's affect was a "little flat," she did not appear very anxious. (R. at 499.) Her blood pressure reading was

112/80. (R. at 499.) Mullins's back was "a little tender with decreased range of motion." (R. at 499.) Dr. Roatsey recommended diet and exercise and advised her to return in six months or as needed. (R. at 499.) On April 13, 2011, Mullins complained that her heart had been racing, and she had been tired and weak. (R. at 497.) Her blood pressure reading was 98/60. (R. at 497.) Mullins had no abnormal physical examination findings other than a dog bite on her leg. (R. at 497.) Dr. Roatsey diagnosed fatigue, hyperlipidemia, hypertension and tachycardia. (R. at 497.) An EKG showed no abnormalities. (R. at 497.) On April 16, 2011, Mullins was admitted to Mountain View Regional Medical Center for complaints of chest pain. (R. at 405-11, 413-64.) At that time, Mullins's blood pressure reading was 144/89, and a cardiac monitor showed a normal sinus rhythm. (R. at 404, 407.) Chest x-rays were normal, and an ECG was consistent with an infarction. (R. at 491.) She was diagnosed with chest pain of unknown etiology that was treated with aspirin and nitroglycerin paste. (R. at 407, 411.)

On May 5, 2011, Mullins's physical examination was normal, with the exception of some tenderness in her back. (R. at 495.) Mullins reported that her medication had made a difference in her chest pain and hypertension and that she felt good. (R. at 495.) On June 6, 2011, Mullins reported muscle pain after starting Zocor. (R. at 493.) Physical examination revealed mild musculoskeletal tenderness and a blood pressure reading of 130/78. (R. at 493.) Dr. Roatsey diagnosed myalgias secondary to Zocor. (R. at 493.) On October 7, 2011, Mullins saw Dr. Roatsey to discuss increasing her dosage of Zoloft. (R. at 606-08.) A mental status examination revealed a depressed mood and affect, but appropriate insight and judgment. (R. at 608.) Mullins's physical examination was normal, except for impaired range of motion and tenderness in the low back, but Mullins had normal strength, reflexes and gait. (R. at 607-08.)

-8-

Case 2:14-cv-00050-PMS   Document 16   Filed 05/02/16   Page 8 of 20   Pageid#: 726

On February 17, 2012, Mullins stated that she felt well with minor complaints of congestion and anxiety. (R. at 600.) Although Mullins had tenderness and reduced range of motion of the lumbosacral spine, she had normal strength and reflexes. (R. at 601-02.) A mental status examination revealed a depressed mood, but appropriate insight and judgment. (R. at 601.) On July 26, 2012, Mullins complained of fatigue and weight gain after quitting smoking three months earlier. (R. at 593.) A mental status examination revealed a normal mood and affect, as well as appropriate judgment and insight. (R. at 595.) Blood tests to evaluate Mullins's fatigue were normal. (R. at 595-96.) On September 27, 2012, Mullins reported that she felt well and had a "good energy level." (R. at 588.) Physical examination revealed a well-controlled blood pressure of 120/74 and no abnormalities other than tenderness of the right knee. (R. at 589-90.) Mental status examination revealed a normal mood and affect and appropriate judgment and insight. (R. at 589.) On April 1, 2013, Mullins reported decreased energy and poor sleep. (R. at 619.) She denied any medication side effects and considered her medication effective. (R. at 619.) A physical examination revealed general musculoskeletal tenderness and tenderness with abnormal tissue texture at the T5-T6 level. (R. at 621.) A mental status examination revealed an anxious mood and affect, but appropriate insight and judgment. (R. at 621.) Dr. Roatsey noted that Mullins was "doing well" on Klonopin. (R. at 622.)

On May 2, 2013, Dr. Roatsey completed a physical assessment, indicating that Mullins could occasionally lift and carry items weighing 15 to 20 pounds and frequently lift and carry items weighing 10 to 15 pounds. (R. at 639-41.) He opined that Mullins could stand and/or walk a total of two hours in an eight-hour workday and that she could do so for 30 minutes to one hour without interruption. (R. at 639.) Dr. Roatsey opined that Mullins could sit a total of three hours in an eight-

hour workday and that she could do so for up to one hour without interruption. (R. at 640.) He found that Mullins could occasionally stoop and never climb, kneel, balance, crouch or crawl. (R. at 640.) Dr. Roatsey found that Mullins's abilities to reach and to push/pull were limited. (R. at 640.) He found that Mullins was limited in her ability to work around heights, moving machinery, temperature extremes, humidity and vibration. (R. at 641.) He found that Mullins would be absent from work more than two days a month. (R. at 641.)

That same day, Dr. Roatsey completed a mental assessment, indicating that Mullins had a limited, but satisfactory, ability to maintain personal appearance. (R. at 643-45.) He opined that Mullins had a seriously limited ability to follow work rules; to relate to co-workers; to interact with supervisors; to function independently; to maintain attention/concentration; to understand, remember and carry out complex, detailed and simple job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 643-44.) Dr. Roatsey opined that Mullins had no useful ability to deal with the public; to use judgment; and to deal with work stresses. (R. at 643.) He found that Mullins would be absent from work more than two days a month. (R. at 645.)

On December 29, 2010, Crystal Burke, L.C.S.W., a licensed clinical social worker, saw Mullins for complaints of depression. (R. at 395-96.) Mullins also reported several incidences of sexual assault from the ages eight to 18. (R. at 395.) Burke reported that Mullins appeared depressed and tearful. (R. at 395.) Burke diagnosed major depressive disorder and PTSD. (R. at 395.) On September 26, 2011, Mullins reported that her symptoms of depression had increased after she was denied disability benefits and had recently separated from her husband. (R. at

503.) Mullins stated that she thought about driving off the road after she learned that her disability claim had been denied. (R. at 503.) Burke reported that Mullins was dressed appropriately, she had good hygiene, and her conversation and eye contact were good. (R. at 503.) Burke diagnosed depression and anxiety. (R. at 503.) She assessed Mullins's then-current Global Assessment of Functioning, ("GAF"),[5] score at 75.[6] (R. at 503.) On February 20, 2013, Mullins reported pain and depression. (R. at 613.) A mental status examination revealed a depressed mood with hopelessness and helplessness, but no obvious psychotic symptoms. (R. at 613.) Burke diagnosed depressive disorder and anxiety. (R. at 613.) On March 20, 2013, Mullins reported several stressors, including stress with a neighbor, as well as family, financial and health stressors. (R. at 612.) Mullins also reported poor daily functioning and poor life quality due to pain. (R. at 612.) Burke diagnosed depressive disorder and anxiety disorder. (R. at 612.)

On March 26, 2013, Burke completed a mental assessment indicating that Mullins had a seriously limited ability to make all occupational, performance and personal/social adjustments. (R. at 615-17.) She opined that Mullins would be absent from work more than two days a month. (R. at 617.)

On July 26, 2011, Dr. Richard Surrusco, M.D., a state agency physician, opined that Mullins could perform medium work. (R. at 64-65.) He opined that Mullins could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at

---

[5] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[6] A GAF score of 71 to 80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors ...; no more than slight impairment in social, occupational, or school functioning...." DSM-IV at 32.

-11-

64-65.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 65.)

On August 2, 2011, Julie Jennings, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Mullins suffered from an affective disorder and an anxiety-related disorder. (R. at 62-63.) She opined that Mullins was mildly restricted in her ability to perform her activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 62.) Jennings opined that Mullins had not experienced repeated episodes of decompensation of extended duration. (R. at 62.)

On December 8, 2011, Dr. Joseph Duckwall, M.D., a state agency physician, opined that Mullins could perform medium work. (R. at 75-77.) He opined that Mullins could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 76.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 76-77.)

On December 12, 2011, Jo McClain, P.C., a state agency professional counselor, completed a PRTF, finding that Mullins suffered from an affective disorder and an anxiety-related disorder. (R. at 74-75.) She opined that Mullins was mildly restricted in her ability to perform her activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 74.) McClain opined that Mullins had not experienced repeated episodes of decompensation of extended duration. (R. at 74.)

On April 23, 2013, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Mullins at the request of Mullins's attorney. (R. at 624-34.)

The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Mullins obtained a full-scale IQ score of 79. (R. at 625.) Mullins reported that her anti-depressant medication was helpful; however, she stated that her depression level was a seven on a scale of one to 10. (R. at 628.) Lanthorn reported that Mullins was nervous, tense and fidgety. (R. at 629.) The Minnesota Multiphasic Personality Inventory – 2 ("MMPI-2"), was administered and indicated that Mullins's psychopathology was serious and included confused thinking, difficulties with logic and concentration and impaired judgment. (R. at 630, 632.) Mullins reported that she used to have frequent nightmares related to childhood sexual abuse, but they were now less frequent. (R. at 628.) Lanthorn diagnosed chronic PTSD; major depressive disorder, recurrent, moderate or possibly greater; anxiety disorder with generalized anxiety due to chronic physical problems, limitations, etc.; and borderline intellectual functioning. (R. at 632.) Lanthorn assessed Mullins's then-current GAF score at 50.[7] (R. at 633.)

Lanthorn completed a mental assessment, indicating that Mullins had a more than satisfactory ability to understand, remember and carry out simple job instructions. (R. at 635-37.) He opined that Mullins had a seriously limited ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to deal with work stresses; to function independently; to maintain attention/concentration; to understand, remember and carry out detailed job instructions; to maintain personal appearance; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 635-36.) Lanthorn found that Mullins had no ability to understand, remember and carry out complex job instructions. (R. at 636.) He

---

[7] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." DSM-IV at 32.

-13-

Case 2:14-cv-00050-PMS   Document 16   Filed 05/02/16   Page 13 of 20   Pageid#: 731

found that Mullins would be absent from work more than two days a month. (R. at 637.)

### III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2015); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2015).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Mullins argues that the ALJ erred by improperly determining her residual functional capacity. (Plaintiff's Memorandum In Support Of Her Motion For

Summary Judgment, ("Plaintiff's Brief"), at 5-7.) In particular, Mullins argues that the ALJ erred by failing to give controlling weight to her treating physician, Dr. Roatsey, and her counselor, Burke. (Plaintiff's Brief at 5-7.) She further argues that the ALJ should have given more weight to psychologist Lanthorn's opinion. (Plaintiff's Brief at 6-7.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

Mullins argues that the ALJ did not controlling weight to her treating physician, Dr. Roatsey, and her counselor, Burke. (Plaintiff's Brief at 5-7.) Based on my review of the record, I find this argument unpersuasive. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 416.927(c)(2) (2015). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

The ALJ found that Mullins had the residual functional capacity to perform sedentary work, that did not require more than two hours of standing and/or walking in an eight-hour workday and six hours of sitting in an eight-hour workday; that did not require more than occasional climbing, balancing, stooping, kneeling, crouching or crawling; that did not require more than occasional overhead reaching; that did not require constant reaching in all directions; that did not require more than occasional interaction with co-workers and the public; that allowed her to be off task 10 percent of an eight-hour workday and allowed her to be absent up to one workday a month; and that did not require more than occasional decision making and changes in the work setting. (R. at 16.)

In making this finding, the ALJ noted that he considered Dr. Roatsey's opinion dated June 2009, wherein he opined that Mullins was unable to work. (R. at 14.) The ALJ noted that he was not giving this opinion any weight because the

-16-

commentary contained no specific exertional or nonexertional limitations. (R. at 14.) As noted by the ALJ, determination of disability is reserved to the Commissioner. (R. at 14.) *See* 20 C.F.R. § 416.927(d) (stating "[a] statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.") In addition, the ALJ considered the physical and mental assessments completed by Dr. Roatsey and Burke in 2013 and noted that he was giving them "limited weight." (R. at 18.) The ALJ noted that the restrictions placed on Mullins's work-related abilities were inconsistent with their treatment notes and Mullins's daily activities. (R. at 18.)

Burke completed a mental assessment indicating that Mullins had a seriously limited ability to make all occupational, performance and personal/social adjustments. (R. at 615-17.) She opined that Mullins would be absent from work more than two days a month. (R. at 617.) The ALJ noted that Burke's assessment was inconsistent with her progress notes and the medical evidence of record. (R. at 18.) Burke saw Mullins in September 2011 for complaints of increased depression after being denied disability benefits. (R. at 503.) Burke diagnosed Mullins with depression and anxiety and assessed her then-current GAF score at 75, indicating no more than slight impairments. (R. at 503.) It appears that Burke next counseled Mullins in February and March 2013 for complaints of depression and stress resulting from a divorce, family and financial matters. (R. at 612-13.)

The ALJ further noted that Dr. Roatsey's mental and physical restrictions were inconsistent with his treatment notes and the evidence of record. (R. at 18.) In June 2009, Dr. Roatsey documented numerous positive examination findings related to Mullins's lumbar spine problems, including tenderness, decreased range of motion, a positive straight leg raising test on the left, weakness and foot drop,

-17-

(R. at 390), but many of these findings either were never again documented or specifically noted to be negative during his examinations. (R. at 388, 493, 495, 497, 499, 589-90, 601-02, 607-08, 621.) In addition, the diagnostic studies of record fail to show significant limitations. An MRI of Mullins's spine performed in 2003 was within normal limits. (R. at 348.) An MRI of Mullins's lumbar spine performed in 2004 revealed only a bulging disc at the L5-S1 level, but no nerve entrapment or compression. (R. at 298, 340.)

In addition, Dr. Roatsey's own office notes often documented no abnormal findings and failed to document findings consistent with the degree of mental limitations he identified in his mental assessment. (R. at 390, 493, 495, 497, 499, 589, 595, 601, 608, 621.) In April 2008, Mullins complained of some "intermittent anxiety." (R. at 321.) Dr. Wilson diagnosed only minor anxiety. (R. at 321.) In March 2009, Mullins reported that she had problems with anxiety "from time to time, but much better than before." (R. at 314.) In December 2010, Dr. Roatsey noted that, although Mullins's affect was a "little flat," she did not appear very anxious. (R. at 499.) In October 2011 and February 2012, Mullins had a depressed mood and affect, but appropriate insight and judgment. (R. at 601, 608.) In July 2012, Mullins had a normal mood and affect, as well as appropriate judgment and insight. (R. at 595.) In September 2012, Mullins reported that she felt well and had a "good energy level." (R. at 588.) She had a normal mood and affect and appropriate judgment and insight. (R. at 589.) In April 2013, although Mullins had an anxious mood and affect, she considered her medication effective. (R. at 619, 621.) Dr. Roatsey noted that Mullins was doing well on her medication. (R. at 622.)

The ALJ also noted that Mullins had only mild restrictions in activities of daily living because she lived alone and performed her own cooking, cleaning, laundry and shopping. (R. at 15, 44-46, 216.) Mullins also reported that she maintained social contacts with friends and visited her grandchildren. (R. at 15, 47-48, 217.) Furthermore, Mullins routinely reported that her medication helped her symptoms of anxiety and depression. (R. at 619, 622, 628.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

The ALJ also considered Lanthorn's opinion and gave it "limited weight." (R. at 19.) The ALJ noted that Lanthorn's opinion was inconsistent with the other evidence of record and not well-supported by his own examination findings. (R. at 19.) Lanthorn's mental status examination revealed no ongoing psychotic processes, nor evidence of delusional thinking. (R. at 628.) Mullins made good eye contact, and a rapport was easily established. (R. at 628.) She reported that her memory was "mostly alright," and her concentration was "fine as long as she is not disturbed." (R. at 628.) Lanthorn indicated that Mullins's communication skills were good, and she was capable of exercising appropriate self-care. (R. at 633.)

Based on this, I find that the ALJ properly weighed the medical evidence and that substantial evidence exists to support the ALJ's finding with regard to Mullins's residual functional capacity. An appropriate Order and Judgment will be entered.

I will deny the plaintiff's request to present oral argument based on my finding that the written arguments adequately address the relevant issues.

DATED: May 2, 2016.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-20-

Case 2:14-cv-00050-PMS   Document 16   Filed 05/02/16   Page 20 of 20   Pageid#: 738